51 CCPA
**Application of Alois M. GEMASSMER.**

**Patent Appeal No. 7072.**

United States Court of Customs
and Patent Appeals.

Jan. 23, 1964.

Clelle W. Upchurch, Pittsburgh, Pa.,
for appellant.

Clarence W. Moore, Washington, D.
C. (Joseph Schimmel, Washington, D. C.,
of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, and
RICH, MARTIN, SMITH and ALMOND,
Judges.

MARTIN, Judge.

This appeal is from a decision of the
Patent Office Board of Appeals affirming
the examiner's rejection of claims 35, 36,
37 and 38 of appellant's application serial
No. 626,253, filed December 4, 1956, for
ISOCYANATES. Five claims stand allowed.

Claims 35–38 read:

"35. The process of Claim 30 [1]
wherein the reaction mixture is flowed through a falling film evaporator
and is stirred as it is heated in the
evaporator.

"36. As a new composition of
matter, the reaction product of an
organic diisocyanate selected from
the group consisting of aromatic,
cyclo-aliphatic and acyclic aliphatic
diisocyanates with an alcohol having
from 1 to 4 hydroxyl groups, said
product having the general formula

$$(OCN \ R_1NH \ COO)_nR_2$$

wherein $R_1$ represents the nucleus
of the organic diisocyanate, $R_2$ represents the nucleus of the alcohol
and n is from one to four, said reaction product containing at least
about 80 per cent of the number of
unreacted —NCO groups theoreti-

1. Allowed claim 30 reads:
"In the preparation of the reaction
product of an organic diisocyanate selected from the group consisting of aromatic, cyclo-aliphatic and acyclic aliphatic
diisocyanates and an alcohol having from
one to four hydroxyl groups by a process which comprises mixing the diisocyanate with the alcohol in a ratio
providing an excess of diisocyanate over
that theoretically required for a different
molecule of diisocyanate to react with
each hydroxyl group of the alcohol and
thereafter effecting chemical reaction
therebetween whereby the two reactants
become joined together through a urethane linkage, the improved method of
removing unreacted diisocyanate from the
reaction mixture after reaction has ceased
which comprises flowing the said reaction mixture as a thin film and heating
the film at a temperature above the boiling point of the unreacted diisocyanate
but below about 250°C. while agitating
the film of the reaction mixture to avoid
any quiescence, thereby avoiding any substantial amount of reaction between unreacted—NCO groups of the product and
said urethane linkages."

cally possible when a different mol of organic diisocyanate reacts with each hydroxyl group of the alcohol to form a reaction product having the said formula and containing one urethane linkage and one unreacted —NCO group for each hydroxyl group which was present on the alcohol, and, in admixture with said reaction product, the product formed when an —NCO group reacts with at least one of the hydrogen atoms shown in the above formula, the amount of product formed by said reaction with the hydrogen atom being limited to not more than the amount that would be formed by reaction of 15 per cent of the theoretically possible —NCO groups of the above formula with said hydrogen atom, said admixture containing less than about 2 per cent unreacted organic diisocyanate.

"37. The composition of Claim 36 wherein the organic diisocyanate is toluylene diisocyanate.

"38. The composition of Claim 37 wherein the alcohol is a mixture of trimethylol propane and butylene glycol."

In practicing the invention, an organic diisocyanate is admixed with an alcohol having one to four reactive hydrogen atoms in a ratio such that more mols of the diisocyanate are present than are required for each of the reactive hydrogen atoms in the alcohol to react with a different molecule of the diisocyanate. After the admixture, reaction between the diisocyanate and alcohol is brought about preferably within the temperature range of about 20°C. to 100°C. to produce a low molecular weight reaction product (I) corresponding to $(OCNR_1NHCOO)_nR_2$ in claim 36. Reaction product (I) contains at least 80 per cent of the number of unreacted —NCO groups theoretically possible when a different mol of organic diisocyanate reacts with each hydroxyl group of the alcohol, and also contains one urethane $(-N\overset{O}{\overset{\|}{C}}OO-)$ linkage and one unreacted isocyanate (—NCO) group for each hydroxyl group which was present in the alcohol.

Using as illustrative the case where toluylene diisocyanate is the diisocyanate and trimethylol propane is the alcohol, the record sets out that the following chemical equation is representative of the reaction:

After formation of reaction product (I) such quantity of unreacted diisocyanate is removed from the reaction mixture containing that product so that the resultant reaction mixture contains less than about 2 per cent unreacted organic diisocyanate. The removal of unreacted diisocyanate is accomplished by distillation at temperatures of above 150°C., and higher, carried out so that the dwell

2. (I′) is species of $(OCNR_1NHCOO)_nR_2$ in claim 36.

above 100°C. is for only a short duration of time and temperatures above about 250°C. are avoided. In a preferred embodiment of the invention at least the last portion of the diisocyanate is removed in a falling film evaporator under conditions which avoid quiescence.

In describing the distillation, appellant states that, when the reaction mixture containing reaction product (I) "is heated in the presence of a compound having an unreacted —NCO group to above 100°C., there is a tendency for the —NCO group to react with the hydrogen atom on the urethane linkage [of reaction product (I)]" to form a side reaction product. This side reaction is represented in the application by the following equation:

$$(2) \ R_1 (OOCNHR_2NCO)_n + \text{unreacted } OCNR_2NCO \longrightarrow$$

$$R_1 \ (O\!-\!\overset{\|}{\underset{O}{C}}\!-\!\overset{|}{N}\!-\!R_2NCO)_n$$

$$\overset{|}{\underset{HNR_2NCO}{C=O}}$$

$$(II)[3]$$

wherein $R_1$ and $R_2$ may be either an aliphatic or an aromatic organic radical and n is at least one and usually not more than five [4] or, illustrating with toluylene diisocyanate and reaction product (I′), the equation becomes

$$(II')[5]$$

[3]. Such product has been termed by the Patent Office as an allophanate. "Allophanates" is defined in Webster's New International Dictionary (1949) as a carboxyl derivative of urea.

[4]. The only specific type of compound that the board, as well as the briefs before us, has interpreted the product in claim 36 that is admixed with $(OCNR_1NHCOO)_nR_2$ to be is an allophanate of the type formed by the reaction of an —NCO group of *unreacted* diisocyanate, a starting material for reaction product I, with the hydrogen atom on the urethane linkage of reaction product I.

[5]. (II′) is a species of reaction product (II).

Appellant discloses that his composition containing less than about 2 per cent unreacted diisocyanate and having at least 80% the theoretical amount of available —NCO groups is advantageous for use in preparing lacquers. He states that undesirable toxicity is avoided by the low concentration of the unreacted diisocyanate. Also, he teaches that the small amount of side reaction that does occur when the distillation is brought about provides a product that "has advantageous solubility characteristics for use in making lacquers."

The references are:

| | | | |
|---|---|---|---|
| Catlin | 2,284,637 | June | 2, 1942 |
| Rinke et al. | 2,511,544 | June | 13, 1950 |
| Viard | 2,703,810 | March | 8, 1955 |
| Seeger et al. | 2,733,261 | Jan. | 31, 1956 |
| Bunge et al. | 2,855,421 | Oct. | 7, 1958 |

The Bunge et al. patent describes polyisocyanates obtained by reacting a diisocyanate such as toluylene diisocyanate with a polyalcohol such as trimethylol propane "in quantitative proportions of more than 1 and less than 2 isocyanate groups per hydroxyl group of the polyalcohol." Those polyisocyanates are said to have substantially no vapor pressure and, therefore, to be physiologically harmless. It is further suggested that they can be used for making lacquers.

The Catlin patent discloses synthetic polymeric materials involving the reaction of a polyalcohol and a diisocyanate. The polymeric materials are obtained by heating substantially chemically equivalent quantities of the reactants to a temperature within the range of 90°C. to 170°C. until solidification of the polymer takes place.

The Rinke et al. patent discloses the reaction of a polyalcohol and a diisocyanate to form a high molecular polymerization product. The reaction is performed by heating the reactants in a boiling solvent, such as dioxane, for several hours.

The Viard patent discloses products obtained by the reaction of diisocyanates on glycol urethanes (glycol carbamates). Viard's products may contain free isocyanate groups. The products disclosed in the Viard patent are useful in the manufacture of varnishes. Viard teaches that one can produce different products within the scope of his invention not only by changing the raw materials which enter into the reaction, but by changing the reaction conditions, either upon the same raw materials or while also changing the raw materials.

The Seeger et al. patent describes a mono-adduct of a polyisocyanate and monohydric phenol. In the preparation of the mono-adduct in a suitable inert solvent, an excess of the polyisocyanate is usually provided so that the mono-adduct which separates will be substantially pure.

The board sustained the examiner's rejection of claims 36–38 over the "art." It stated that appellant has "admittedly used [his composition] for the same purpose as the art product." It also considered the art "sufficiently analogous as to the reactants and proportions thereof employed to establish that the reaction and the product are old, particularly when considered with the numerous statements of appellant to the effect that his product is merely that of the art in purified form." The board further stated:

"As the Examiner aptly states in response to appellant's argument that the claims are not directed to the old compound *per se* but to the isocyanate product having 'up to 15%' of an allophanate which tends to form at 100°C. admixed therewith and contains less of the diisocyanate, the composition need not con-

tain any substantial amount of the allophanate as 'not more than 15% reads on substantially none.' "

The board also sustained the rejection of claims 36, 37 and 38 as improperly defining a product by its method of production. The board noted that the main product of the process, reaction product (I), is defined by structure but regarded the "allophanate" by-product as defined in incomplete process terms. The board stated that, although appellant attempts to justify the use of the process to define this component of the claimed mixture, "asserting that there is indefiniteness as to the extent of the reaction and the positioning of the —NCO group," the reaction equation (2)[6] on page 5 of the description "does not support appellant in this respect and since this component can be otherwise defined, the rejection is well founded."

The board also sustained the examiner's rejection of claim 35, stating:

"The Examiner has also rejected the claims [all the claims in the application] as not properly defining the invention for the various reasons stated on page 8 of the answer. Claim 35 is not only considered improperly reciting the structural limitation but the Examiner states that this is the obvious means of evaporating a film, hence the claim is considered a duplicate of claim 30 and we agree with the Examiner in the latter respect, particularly as appellant has not commented thereon, hence this rejection will be sustained.

Other rejections of the claims based on the examiner's holding that they failed to properly define the invention were not sustained by the board.

Appellant argues that he has provided the lacquer industry with a low molecular weight polyisocyanate having sufficient —NCO groups to be suitable for reacting with a polyester or the like to make a lacquer and, at the same time, not containing sufficient toxic polyisocyanate to make it unsuitable for use by a lacquer manufacturer, and that this problem is not recognized in any of the references relied upon. He states that in the only two classes of compounds in the Viard patent where enough polyisocyanate is employed to have an unreacted —NCO group in the product, the patentee uses only one mol diisocyanate per hydroxyl group and shows 100% theoretical reaction, with the result that no unreacted polyisocyanate is left over. Appellant further contends that Catlin, Rinke et al., and Seeger et al. all produce high molecular weight resins which do not contain —NOC groups, so they are not polyisocyanates and do not have any unreacted polyisocyanate remaining in the product to make it toxic. Thus, he urges they could not have recognized his problem.

Appellant urges that Bunge et al. do not disclose appellant's compositions. More specifically, he contends that they use only sufficient diisocyanate to provide from 1 to less than 2 —NCO groups per hydroxyl group of the polyhydric alcohol and that such a ratio is less than 1 mol diisocyanate per hydroxyl group required in the production of his reaction product (I). The theoretical minimum requirement to make (I), he urges, is 1 mol diisocyanate or 2 —NCO groups per hydroxyl group. Appellant contends that since reaction product (II) is made from (I), (II) cannot be present in Bunge et al. because (I) is missing.[7]

6. This corresponds to equation (2) cited earlier in the opinion.

7. Appellant has contended that the Bunge et al. patent was cited by the examiner for teaching purposes only and that no rejection was made on the reference. We cannot agree with this contention. The examiner in his answer included the Bunge et al. patent in his citation of the

art of record. He stated that Bunge et al. "is cited to show that which is recognized by applicant to be old in the art" and made several further references to the Bunge et al. patent in supporting his position that appellant's claimed composition is old. The board in its decision in citing the references included the Bunge et al. patent and stated that it

With respect to the rejection of claims 36, 37 and 38 as improperly defining a product by its method of production, appellant states that reaction product (I) (with toluylene diisocyanate and trimethylol propane) has the following formula:

He contends that reaction product (II) is actually a mixture of various compounds and cannot be defined by formula or in any other way except by the process language appearing in appellant's claims. It is urged that there is no way to know which one of the circle hydrogen atoms in the above formula reacts with the excess diisocyanate. He also contends that he has no way of knowing whether only one —NCO group or both —NCO groups of the excess diisocyanate react. In some cases, appellant urges, two of the nitrogens in the above formula might become connected through reaction with both —NCO groups of a molecule of excess diisocyanate. In other cases, he states, only one —NCO group of excess diisocyanate might react leaving one unreacted —NCO group, or 2 mols of reaction product (I) might become connected together by the reaction of one —NCO group of a molecule of excess diisocyanate with a hydrogen of one molecule of reaction product (I) and the reaction of the other —NCO group of the molecule of excess diisocyanate reaction with a hydrogen atom of another molecule of reaction product (I).

As to the rejection of claim 35, appellant urges that claim differs in scope from allowed claims 30 through 34 and is allowable along with them. He states that those allowed claims recite a process wherein a flowing film of a reaction mixture is heated between the boiling point of unreacted diisocyanate and 250°C. while agitating the film to avoid quiescence, and that there is more than one way to do this. Appellant states that he prefers to effect this heating in a falling film evaporator as recited in claim 35. The Patent Office, he contends, has failed to recognize that other means of flowing a film and heating it while it is agitated can be effected, for example,

will sustain "the rejection of the claimed composition as unpatentable over the art." Moreover, it is noted that appellant has assigned as an error the board's failing "to reverse the rejection of Claims 36 to 38 on the grounds that these claims do not distinguish appellant's product from that of Bunge and that Bunge's product contains allophanate linkages.

pumping the reaction mixture horizontally through a conduit while heating the conduit.

The issues in this appeal are: (1) the patentability of claims 36, 37 and 38 over the cited art, (2) the rejection of claims 36, 37 and 38 as *improperly defining a product by its method of production*, and (3) the rejection of claim 35 as being a substantial duplicate of allowed claim 30.

*Issue No. 1.*

■ The board has stated that the cited art "is sufficiently analogous as to the reactants and proportions thereof employed" to establish that the claimed composition is old, "particularly when considered with the numerous statements of appellant to the effect that his product is merely that of the art in purified form." We do not agree with the board's holding that the claimed composition is old. A comparison of the cited art and appellant's composition convinces us that the chemical differences between the two types of compositions patentably distin-

guish appellant's composition from the prior art compositions.

Claim 36 requires that the low molecular weight compound $(OCNR_1NHCOO)_nR_2$, i. e. reaction product (I), contain at least about 80 per cent of the number of unreacted —NCO groups theoretically possible when a *different* mol of organic diisocyanate reacts with *each* hydroxyl group of the *alcohol*. Appellant in his application teaches that under most conditions at least about 1.5 mols of the organic diisocyanate *per hydroxyl group or reactive hydrogen atom in the alcohol* should be used.

In none of the cited art do we find this teaching. Rinke et al. make *high molecular weight resinous polymers* and in preparing them do not disclose any particular ratio of the diisocyanate and alcohol used.

Catlin makes *linear polymers* in which *substantially chemically equivalent quantities of a dihydric alcohol and a diisocyanate are reacted*. The patentee teaches that the reaction involved may be:

$$y(HXRXH) + y(XCNR'NCX) \rightarrow \left( \begin{array}{c} -RXCNRHR'NHCX- \\ X \qquad\qquad X \end{array} \right)_y$$

wherein R and R′ are divalent organic radicals which may be the same or different and X is a member of the class consisting of oxygen and sulfur, and y is the number of units in the polymer chain. It should be noted that the same number of mols of alcohol and diisocyanate are utilized in the above equation.

Seeger et al. make a mono-adduct of a diisocyanate and a *monohydric phenol*. The patentees do not define the minimum and maximum amounts of reactants employed but merely state that usually "an excess of the polyisocyanate is provided so that the product which separates will be substantially pure mono-adduct."

Viard discloses the reaction of isocyanates on glycol urethanes. In the only relevant examples the patentee, as indicated by the respective equations in the examples, reacts *one mol* of diisocyanate with *one mol* of glycol urethane. There is no suggestion in the patent that an excess of diisocyanate is reacted with the glycol urethane.

Bunge et al. describe the reaction of diisocyanates and only polyalcohols. This reaction is achieved by applying the reactants "in quantitative proportions of more than 1 and less than 2 isocyanate *groups* per hydroxyl group of the poly-

alcohol." [emphasis ours], e. g., using 1 mol of a dihydric alcohol, there would be employed *less than* 2 mols of a diisocyanate. In contrast appellant prepares his composition by mixing *more* mols of the diisocyanate than are required for each of the reactive hydrogen atoms in the alcohol to react with a different molecule of the diisocyanate.

Claim 36 also specifies that the product containing unreacted —NCO groups is "in admixture" with an allophanate.[8] In none of the compositions of the cited art do we find a suggestion that an "allophanate" is present.

It is contended by the Patent Office that the concept of using an excess of the diisocyanate is disclosed in Catlin and hence the use of an an excess of diisocyanate in the Bunge et al. patent would involve nothing more than the skill of the ordinary organic chemist. The Patent Office relies on the following recitation in Catlin:

> "Lower molecular weight viscosity-stabilized polymers, capable of remaining unchanged under continued conditions of heating as in melt-spinning, film-pressing, or compounding, can be prepared by adding one reactant in excess of the chemically equivalent amount or by adding a small amount of a different glycol or a monohydric alcohol, or their sulfur analogues. Similarly, rather than an excess of the diisocyanate * * * being employed, a small amount of some other diisocyanate * * * may be used."

We do not consider that teaching in Catlin any better than the teaching in the Bunge et al. patent.[9]

The Patent Office contends that the recitation including the words "not more than 15%" relating to reaction product (II) reads on substantially none of that product. We cannot agree. Claim 36 specifically requires that reaction product (I) be "in admixture" with reaction product (II). Moreover, appellant in his application teaches that only a "small" amount of reaction product (II) is needed to better the solubility of his claimed composition.

The Patent Office urges that reaction product (II) is inherently produced in the Bunge et al. patent, since the same reactants are used in the same ratios at substantially the same reaction temperature. However, as we have already indicated, different ratios of reactants are used in the two processes. Also appellant's process involves heating the reaction mixture to above 100°C. and particularly at 150°C. and above. The highest temperature recited in the Bunge et al. patent is 70°C.

*Issue No. 2.*

█ We do not think that claims 36, 37 and 38 improperly define a product by its method of production. In defining that product, claim 36 reads:

> " * * * the product formed when an —NCO group reacts with at least one of the hydrogen atoms shown in the above formula, the amount of product formed by said reaction with the hydrogen atom being limited to not more than the amount that would be formed by reaction of 15 per cent of the theoretically possible —NCO groups of the above formula $[OCNR_1NHCOO)_nR_2]$ with said hydrogen atom, * * * "

That language has been specifically interpreted by the Patent Office and appellant as involving, not merely the reaction of an isocyanate with $(OCNR_1NHCOO)_nR_2$, but rather, the reaction of the *—NCO groups of unreacted diisocyanate* with the *hydrogen atom* on the urethane (–NCOO–) linkage of $(OCNR_1-$

---

8. See footnote 4.

9. Referring to equation (3), cited earlier in the opinion, the excessive diisocyanate in

Catlin would suggest the use of more than 1 mol of the diisocyanate per mole of dihydric alcohol. Bunge et al. suggests this.

## 810

NHCOO)$_n$R$_2$. Although that reaction could include the formation of a product with the structural formula

$$R_2 \; (O\text{--}C\text{--}N\text{--}R_1NCO)_n$$
$$\overset{|}{O} \quad \overset{|}{C}=O$$
$$\overset{|}{H\text{--}N\text{--}R_1NCO}$$

we agree with appellant that it could also involve the reaction of one or both —NCO groups of unreacted diisocyanate with one, two or three hydrogens on the urethane linkages of one or more molecules of (OCNR$_1$NHCOO)$_n$R$_2$. Accordingly we consider the language in claim 36 describing the product involved proper and adequate.

*Issue No. 3.*

█ The board sustained the examiner's rejection of claim 35 on the basis that it is "a duplicate of claim 30." We cannot agree. Claim 35 recites a falling film evaporator while claim 30 is directed to any means of flowing a film and heating it while it is agitated. Clearly claim 35 differs in scope from claim 30. In view of the common practice in allowing an inventor a reasonable latitude in defining his invention by more than one claim as referred to in In re Wood et al., 155 F.2d 547, 33 CCPA 984, we believe it proper to allow claim 35.

The reasons assigned by the board for denying appellant's claims 35, 36, 37 and 38 having been found to be in error, the decision of the board as to those claims is reversed.

Reversed.

WORLEY, Chief Judge (concurring).

I am not so positive as the majority appears to be that the board committed reversible error with respect to claims 36 to 38. To me it is a very close question, one which I decide only by resolving the doubt in favor of applicant.